UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------X

In re Sundial Growers Inc. Securities Litigation

Master File No. No. 1:19-cv-08913-ALC

<u>CLASS ACTION</u>

THIS DOCUMENT PERTAINS TO:
ALL ACTIONS

<u>JURY TRIAL DEMANDED</u>

--------------------------------------------------------X

## <u>AMENDED CONSOLIDATED COMPLAINT</u>

Co-Lead Plaintiffs 0998735 BC LTD and David Draiman ("Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Amended Consolidated Complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys that included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sundial Growers Inc. ("Sundial" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations of strict liability and negligence set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Sundial common stock pursuant and/or traceable to Sundial's Registration Statement and Prospectus (collectively "Offering Documents").

issued in connection with the Company's initial public offering on August 1, 2019 ("IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' Securities Act of 1933 ("Securities Act") and Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303") violations ("Class").

2.      Based in material part on its ability to grow revenue from producing and selling cannabis in Canada, Defendants raised $134.4 million in Sundial's August 1, 2019 IPO. In the Offering Documents, however, Defendants omitted that prior to the IPO, quality control issues at its flagship growing facility had contaminated material amounts of product that Sundial had shipped with moisture, mold, fungus, and detritus such as plastic matter. Before the IPO, these quality control failures resulted in material customer returns during the second quarter of 2019, for which Defendants included estimated financial results in the Offering Documents. Both these material returns in Sundial's first quarter of material operations and risk disclosures concerning quality control in the Offering Documents rendered Defendants duty-bound to disclose both the quality control problems and the likelihood of material returns in the future. Defendants' omission from the Offering Documents of the quality control issues and the resulting material returns, therefore, rendered the Offering Documents materially false and misleading.

3.      Sundial was incorporated in 2006 as a small greenhouse operator focused on vegetables. It began cultivating cannabis in 2012 and started selling it in 2018 after the federal legalization of adult-use cannabis in Canada. Most of the Company's sales are to other licensed cannabis producers. After receiving a cultivation license from Health Canada, on October 9, 2018, Sundial held a ribbon cutting ceremony to celebrate the opening of its flagship facility in Olds, Alberta (the "Olds Facility").

4.      The Olds Facility began to experience quality control problems soon after it opened and began cultivating cannabis late in 2018. Former Sundial employees described issues with moisture, mold, and fungus in the facility in 2018 and 2019. The basement nursery was frequently flooded, sometimes with sewage.

5.      During the summer of 2019 prior to Sundial's IPO, the quality control problems at the Olds Facility materially impacted at least 10% of the cannabis Sundial sold. During the second quarter of 2019, which ended on June 30, 2019, Zenabis Global Inc. ("Zenabis"), another Canadian cannabis company returned or rejected a total of 554 kilograms that Sundial supplied because it contained visible mold, parts of rubber gloves, and other non-cannabis material. The return was the equivalent of 10% of Sundial's total second-quarter cannabis sales of five metric tons. Sundial executives, however, asked Zenabis to defer returning that shipment until the third quarter, after the IPO, so that it would not impact the second quarter 2019 results included in the Company's forthcoming Registration Statement and Prospectus.

6.      Sundial's Registration Statement and Prospectus was also materially misleading because the Company's estimated financial results for the second quarter of 2019 incorporated revenue from sales that had not yet taken place. Sundial agreed with certain customers that the Company would issue invoices for product during the second quarter of 2019 and recognize revenue at that time – despite the fact that the product was not all shipped until subsequent quarters – in violation of accounting standards as well as Sundial's own revenue recognition policy. Sundial accelerated shipments of C$3 million to C$4 million of revenue during the second quarter of 2019, a material portion of the gross revenue between $19.0 million and $21.0 million and net revenue to be between $18.0 million and $20.0 million that it estimated for the quarter in the Prospectus.

7.     On July 5, 2019, Sundial filed a Registration Statement on Form F-1 with the SEC ("Registration Statement"). Each of the Individual Defendants signed the Registration Statement, which Defendants used to sell Sundial stock to investors in the IPO.

8.     On July 31, 2019, the Company announced that it would offer 11,000,000 common shares at $13.00 per share. On August 1, 2019, Sundial filed with the SEC the Offering Documents. On the same day, the Company's shares were listed for trading on Nasdaq in U.S. dollars under the ticker symbol "SNDL." In total, Sundial raised gross proceeds of approximately $134.4 million, excluding $8.58 million in commissions paid to the Underwriter Defendants.

9.     The Offering Documents contained untrue statements of a material facts and/or omitted to state material facts that Defendants were duty-bound to disclose to make the statements therein not misleading. First, the Offering Documents omitted material and persistent quality control problems that had resulted in material returns in advance of the IPO. Second, the Offering Documents provided revenue estimates that included material, improperly accelerated revenue. As such, Sundial's estimated revenue for the third quarter of 2019 was ***not*** between $19.0 million and $21.0 million gross and between $18.0 million and $20.0 million net.

10.    Defendants' misrepresentations in and omissions from the Offering Documents violated Sections 11, 12(a)(2), and 15 of the Securities Act. These violations caused Plaintiffs and the members of the Class to suffer damages.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v).

13.     Venue is proper in this Judicial District pursuant to 15 U.S.C. § 77v. Sundial securities are traded on Nasdaq, located within this Judicial District.

14.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

15.     Plaintiffs purchased or otherwise acquired Sundial stock pursuant and/or traceable to Sundial's Registration Statement and Prospectus issued in connection with the Company's IPO on August 1, 2019.

16.     Defendant Sundial is incorporated in the Province of Alberta, Canada and maintains its principal executive offices at #200, 919 – 11 Avenue SW, Calgary, AB T2R 1P3, Canada. Sundial purports to produce and market craft pioneering cannabis brands to "Heal, Help and Play." In addition to its facilities in Canada, Sundial acquired Bridge Farm Nurseries Limited, in the United Kingdom, in July 2019. The Company's common shares are listed for trading only on the Nasdaq exchange under the ticker symbol "SNDL".

17.     Defendant Torsten Kuenzlen ("Kuenzlen") is, and was at the time of the IPO, a member of Sundial's Board of Directors and the Company's Chief Executive Officer ("CEO"). At the time of the IPO, Kuenzlen owned approximately 3.7 million Sundial shares, or 4.94% of the Company's common stock.

18.     Defendant James Keough ("Keough") is, and was at the time of the IPO, Sundial's Chief Financial Officer ("CFO").

19.     Defendant Edward Hellard ("Hellard"), is, and was at the time of the IPO,

Sundial's Executive Chairman of the Company's Board of Directors. He is the Company's largest shareholder. At the time of the IPO, Hellard owned approximately 24.5 million Sundial shares, or 32.3% of the Company's common stock.

20.     Defendant Greg Mills is, and was at the time of the IPO, Non-Executive Chairman of the Company's board of directors.

21.     Defendant Gregory Turnbull is, and was at the time of the IPO, a member of the Company's board of directors.

22.     Defendant Lee Tamkee is, and was at the time of the IPO, a member of the Company's board of directors.

23.     Defendant Elizabeth Cannon ("Cannon") is, and was at the time of the IPO, a member of the Company's board of directors.

24.     Defendants Kuenzlen, Keough, Hellard, Mills, Turnbull, Tamkee, and Cannon each signed the Registration Statement (defined below) used to conduct the IPO and are referred to herein as the "Individual Defendants."

25.     The Individual Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of the Company's SEC filings alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with the Company, and their access to material information available to them but not to the public, the Individual Defendants knew or should have known that the adverse facts specified herein had not been disclosed to the public.

26.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"), required the Offering Documents to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Item 303 also required the Offering Documents to disclose events that the registrant knew would "cause material change in the relationship between costs and revenues."

27.     The failure to disclose the facts the Offering Documents omitted, as alleged further below, violated Item 303 because Defendants were aware of them and these adverse, undisclosed facts would, and ultimately did, have an unfavorable impact on Sundial's sales, revenues, and income from continuing operations. Moreover, Item 303 required disclosure because these material, adverse facts were known events or uncertainties that, at the time of Sundial's IPO, had caused or were reasonably likely to cause Sundial's disclosed financial information not to be indicative of its future operation results, and likely materially and adversely to affect Sundial's future results and prospects.

28.     Defendant Cowen and Company, LLC ("Cowen") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents. Cowen's principal place of business is located at 599 Lexington Avenue, New York, NY 10022. Cowen's registered agent for service of process in New York is Cogency Global Inc., 10 East 40th Street, 10th Floor, New York, NY 10016. Cowen or its affiliates make a market in the common stock of Sundial, and as of September 3, 2019, Cowen or its affiliates beneficially own 1% or more of the common stock of Sundial

29.     Defendant BMO Nesbitt Burns Inc. ("BMO") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents.

BMO's principal place of business is located at 100 King Street West, Toronto, Ontario M5X 1H3, Canada.

30.     Defendant RBC Dominion Securities Inc. ("RBC") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents. RBC's principal place of business is located at 200 Bay Street, Suite 400, South Tower, Toronto, Ontario M5J 2W7, Canada.

31.     Defendant Barclays Capital Canada Inc. ("Barclays") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents. Barclays' principal place of business is located at 333 Bay Street, Toronto, ON M5H 2R2, Canada.

32.     Defendant CIBC World Markets Inc. ("CIBC") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents. CIBC's principal place of business is 161 Bay Street, Brookfield Place, Toronto, Ontario M5J 2S8, Canada.

33.     Defendant Scotia Capital Inc. ("Scotia") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the Offering Documents. Scotia's principal place of business is 40 King Street West Scotia Plaza 68th Floor Toronto, ON M5W 2X6, Canada.

34.     Cowen, BMO and RBC were joint book-running managers or lead underwriters for the IPO. Barclays and CIBC were bookrunners and Scotia was a co-manager for the IPO.

35.     Defendants Cowen, BMO, RBC, Barclays, CIBC, and Scotia are referred to herein as the "Underwriter Defendants."  The Underwriter Defendants' failure to conduct adequate due diligence investigations was a substantial factor in the dissemination of the false and misleading

Offering Documents.

36.     Representatives of the Underwriter Defendants also assisted Sundial and the Individual Defendants in planning the IPO, purporting to conduct an adequate and reasonable due diligence investigation into the business, operations, products, and plans of Sundial. During the course of their investigations, the Underwriter Defendants had continual access to confidential corporate information concerning Sundial's business, financial condition, products, plans, and prospects.

37.     In addition to having access to internal Sundial documents, the Underwriter Defendants and/ or their agents, including their counsel, had access to the Company's lawyers, management, directors, and top executives. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Sundial's management and top executives, at a minimum, the Underwriter Defendants should have known of the Company's undisclosed existing problems and plans and the material falsity of the Offering Documents.

38.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with the offers and sales of the Company's shares pursuant and/or traceable to the IPO and relevant IPO materials, including to Plaintiffs and the Class. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Offering Documents.

39.     The Company, the Individual Defendants and the Underwriter Defendants are referred to herein collectively as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

*Background*

40.     Sundial describes its mission as crafting cannabis brands to "Heal, Help and Play." Since 2018, when Canada legalized adult-use cannabis, the Company has produced and marketed what it describes as premium cannabis.

41.     Stanley Swiatek ("Swiatek") founded Sundial in 2006 as a small greenhouse operator in Rocky View, Alberta focused on cucumbers. In 2013, after the Canadian government announced that it was turning over the production and distribution of medical marijuana for the country's 38,000 licensed users to commercial growers, Swiatek began converting his greenhouse to grow marijuana. Due to risk created by local opposition in Rocky View, Swiatek built a new facility in Olds, Alberta, breaking ground in July 2017.

42.     In October 2017, Defendant Hellard began buying a large stake in Sundial. Initially, on October 31, 2017, Hellard purchased 800,000 shares from now-former director Shelley Unser ("Unser") and 2,400,000 shares from Swiatek. On January 15, 2018, Sundial entered into a credit agreement with 2082033 Alberta Ltd., controlled by Hellard, and subsequently amended and restated this agreement on August 16, 2018, as the Investment and Royalty Agreement. In the fiscal year ended December 31, 2018, a total of $10.9 million had been invested under the Investment and Royalty Agreement in consideration for the issuance of 7,149,035 of Sundial common shares to Hellard. Hellard purchased an additional 4 million shares in early 2018 from Swiatek and Unser. Hellard also received 50,963 shares in July 2019 in consideration for advancing the remaining funds available to be advanced under the Investment and Royalty Agreement and was entitled to 3,680,000 shares and 480,000 share purchase warrants (each exercisable for one common share at an exercise price of $15.94 for a period of three years from the date of issue) issuable in connection with the termination of the Investment and Royalty

Agreement upon consummation of the IPO. As a result, immediately prior to the IPO, Hellard was

by far Sundial's largest shareholder, with 24,493,333 shares of Sundial common stock, or 32.30%

of the Company's shares before the IPO.

43.     In early 2018, Sundial turned over its leadership team. Swiatek exited the

Company, which repurchased a total of 9,815,701 common shares from him for total consideration

of $16.5 million. On February 20, 2018, the Company announced in a press release that Defendant

Hellard was joining Sundial as "the organization's leader." Defendant Kuenzlen joined the

Company within one week.

44.     On October 9, 2018, Sundial held a ribbon cutting ceremony to celebrate the

opening of its new facility in Olds. The Company's plan for the facility included 140 cultivation

rooms capable of producing over 100 million grams of cannabis annually.

45.     The Olds Facility began to experience quality control problems soon after it

opened and began cultivating cannabis. Former Sundial employees described material problems

with moisture, mold, and fungus. One former employee stated that the basement nursery was

frequently flooded, sometimes with sewage.

46.     By the summer of 2019, when Defendants were planning the IPO, the quality

control issues at the Olds Facility had materially impacted Sundial's revenue. During the second

quarter of 2019, which ended on June 30, 2019, Sundial customer Zenabis returned or rejected a

total of 554 kilograms that Sundial supplied because it contained visible mold, parts of rubber

gloves, and other non-cannabis material. The return was the equivalent of more than 10% of

Sundial's total second-quarter cannabis sales of five metric tons.

47.     Sundial executives asked Zenabis to wait to make the return until the third quarter

after the IPO.

48.     After the end of the second quarter, Zenabis terminated its agreement to purchase cannabis from Sundial due to the problems with this shipment and the impact on Zenabis's own ability to supply its customers. The return was an event under Item 303(a)(3)(i) and an uncertainty under §(ii).

49.     Before launching the IPO, the Individual Defendants improperly recognized revenue in violation of International Financial Reporting Standards ("IFRS") 15, "accelerat[ing]" revenue into the second quarter of 2019 without first shipping the product to customers.

50.     To recognize revenue, IFRS 15 required Defendants to:

a.  identify the contract(s) with a customer.

b.  identify the performance obligations in the contract. Performance obligations are promises in a contract to transfer to a customer goods or services that are distinct.

c.  determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. If the consideration promised in a contract includes a variable amount, an entity must estimate the amount of consideration to which it expects to be entitled in exchange for transferring the promised goods or services to a customer.

d.  allocate the transaction price to each performance obligation on the basis of the relative stand-alone selling prices of each distinct good or service promised in the contract.

e.  ***recognise revenue when a performance obligation is satisfied by transferring a promised good or service to a customer*** (which is when the

customer obtains control of that good or service). A performance obligation may be satisfied at a point in time (typically for promises to transfer goods to a customer) or over time (typically for promises to transfer services to a customer). For a performance obligation satisfied over time, an entity would select an appropriate measure of progress to determine how much revenue should be recognised as the performance obligation is satisfied. (Emphasis added).

51.    During the second quarter of 2019, Sundial issued invoices for product and then recognized the revenue for the sales prematurely, having not yet shipped material amounts of the product in question. Sundial improperly accelerated shipments of C$3 million to C$4 million of revenue in the second quarter of 2019.

52.    In July 2019, Sundial acquired Bridge Farm, announcing in a July 4, 2019 press release that it would use Bridge Farm's three UK-based growing facilities to cultivate hemp and cannabis and making it an international company.

53.    On July 4, 2019, Sundial announced that it had filed a Registration Statement with the SEC for a proposed initial public offering of its common shares. In connection with the offering, the Company announced, it had applied to list its common shares on the Nasdaq Global Select Market.

54.    On July 5, 2019, Sundial filed the Registration Statement on Form F-1 with the SEC. Each of the Individual Defendants signed the Registration Statement, which Defendants used to sell Sundial stock to investors in the IPO.

55.    On July 22, 2019, Sundial announced that it was offering 10,000,000 common shares at an initial price to the public estimated to be between US$12.00 and US$14.00 per share.

56.     On July 31, 2019, the Company announced that it would offer 11,000,000 common shares in the IPO, priced at $13.00 per share. On August 1, 2019, Sundial filed with the SEC the final Prospectus. Copies of the Prospectus were made available to Sundial investors by Defendant Cowen, c/o Broadridge Financial Services, 1155 Long Island Avenue, Edgewood, NY 11717. Pursuant to the Offering Documents, Sundial sold 11 million shares of common stock at $13 per share, for gross proceeds of approximately $134.4 million, excluding $8.58 million in commissions paid to the Underwriter Defendants. The IPO closed on August 5, 2019.

57.     On August 1, 2019, the Company's shares were listed for trading on Nasdaq in U.S. dollars under the ticker symbol "SNDL."

***Materially False and Misleading Statements in the Offering Documents***

58.     The Offering Documents represented that Sundial's estimated revenue for the second quarter was between $19.0 million and $21.0 million gross and between $18.0 million and $20.0 million net.

59.     The foregoing statement was materially false. In violation of IFRS 15 Sundial improperly recognized C$3-4 million in revenue prematurely, accelerating invoices but failing to ship C$3 million to C$4 million of product – 12.2% to 21% of its gross revenue for the quarter as estimated in the Prospectus.

60.     With respect to revenue recognition, the Offering Documents stated:

> **Revenue recognition**
>
> On July 1, 2018 the group adopted IFRS 15 Revenue from Contracts with Customers and as a horticultural grower, the group earns the majority of its revenues from the sale of goods rather than services. It predominantly grows those goods to specific orders, but also retains some finished goods for speculative sale. For all of its contracts ***the group recognises revenue at a point in time, typically on delivery of the goods to customers' premises***, which is when the performance obligations of the transaction are fulfilled (being the transfer of goods to the customer.)

14

*** 

Revenue from the direct sale of cannabis for a fixed price is recognized when the **Company transfers control of the good(s) to the customer, which is at the point of delivery for recreational cannabis**.

Revenue earned in Canada will include excise taxes, which the Company pays as principal, but excludes duties and taxes collected on behalf of third parties. Revenue also includes the net consideration to which the Company expects to be entitled. Revenue is recognized to the extent that it is highly probable that a significant reversal will not occur. Therefore, revenue will be stated net of expected price discounts, allowances for customer returns and certain promotional activities and similar items. Generally, payment of the transaction price is due within credit terms that are consistent with industry practices, with no element of financing.

(Emphasis added).

61.     This statement was materially false because in violation of IFRS 15 and its own accounting policy, it omitted that Sundial prematurely recognized revenue for product that was invoiced but not shipped.

62.     The Offering Documents included risk disclosures, warning that quality control failures, including contamination of or damage to its cannabis inventory, could materially impact production and sales, stating:

> **Failure in our quality control systems may adversely impact our sales volume, market share and profitability.**
>
> The quality and safety of our products are critical to the success of our business and operations. As such, it is imperative that our (and our service providers') quality control systems operate effectively and successfully. Quality control systems can be negatively impacted by the design of the quality control systems, the quality training program, and adherence by employees to quality control guidelines. Although we strive to ensure that all of our service providers have implemented and adhere to high caliber quality control systems, we could experience a significant failure or deterioration of such quality control systems. If, as a result of a failure in our (or our service providers') quality control systems, contamination of, or damage to, our inventory or packaged products

occurs, we may incur significant costs in replacing the inventory and recalling products.

63.     This statement was materially false because it omitted that the risk of material quality control failures had already materialized, causing customers to return material amounts of Sundial cannabis. Before the IPO, Sundial's quality control systems had persistently failed to prevent sewage and other moisture from oozing into grow rooms, promoting mold and fungus growth. As a result of these persistent quality control failures, by the time of the IPO, Sundial had delivered 554 kilograms of unusable cannabis – the equivalent of 10% of Sundial's total second-quarter 2019 cannabis sales of five metric tons – to its customer Zenabis, which Zenabis was then forced to return or reject. In the face of a duty to disclose, the Offering Documents omitted the Company's persistent quality control problems and their impact on revenue and earnings.

64.     The Offering Documents also described that "[i]n our purpose-built indoor modular grow rooms, we produce high-quality, consistent cannabis in individual, fully controlled room environments….Our purpose-built indoor modular grow rooms enable us to produce large volumes of high-quality cannabis in small batches." It then described the company as "consistently delivering high-quality products." Defendants reiterated that "we are steadfast in our approach of consistently delivering high-quality cannabis, which we believe will hold a competitive advantage."

65.     This statement was materially false because it omitted that the risk of material quality control failures had already materialized, causing customers to return material amounts of Sundial cannabis. Before the IPO, Sundial's quality control systems had persistently failed to prevent sewage and other moisture from oozing into grow rooms, promoting mold and fungus growth. As a result of these persistent quality control failures, by the time of the IPO, Sundial had delivered 554 kilograms of unusable cannabis – the equivalent of 10% of Sundial's total second-

quarter 2019 cannabis sales of five metric tons – to its customer Zenabis, which Zenabis was then forced to return or reject. In the face of a duty to disclose, the Offering Documents omitted the Company's persistent quality control problems and their impact on revenue and earnings.

66.     This action was brought within one year of the discovery of the untruthfulness of the statements and omissions and within three years of the IPO.

## CLASS ACTION ALLEGATIONS

67.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class (as defined *supra* at ¶ 1).  Excluded from the Class are Defendants and their family members and directors and officers of Sundial and their families and affiliates.

68.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. There are over 83 million shares of Sundial common stock outstanding, owned by hundreds or thousands of persons.

69.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

a.     Whether Defendants violated the Securities Act;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     Whether Defendants knew or recklessly disregarded that their statements

were false and misleading;

e.     Whether the price of Sundial common stock was artificially inflated; and

f.     The extent of damage sustained by Class members and the appropriate measure of damages.

70.     Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

71.     Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Lead Plaintiffs have no interests which conflict with those of the Class.

72.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

## Violation of Section 11 of The Securities Act Against All Defendants

73.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct. Section 11 is a strict liability statute, subject only to affirmative defenses.

74.     This Count is asserted against all Defendants on behalf of all persons who purchased shares of the Company's common stock pursuant to the Company's IPO, in which shares registered under the Registration Statement were sold, and is based upon Section 11 of the Securities Act. 15 U.S.C. §77k.

75.     The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

76.     The Company is the issuer of the securities and as such is strictly liable for the

18

material misstatements and omissions contained in the Offering Documents. The Individual Defendants each signed the Offering Documents or authorized the signing of the Offering Documents on their behalf, and are therefore liable for the misrepresentations and omissions contained therein and the failure of the Offering Documents to be complete and accurate.

77.     The Underwriter Defendants each served as underwriters in connection with the IPO, which was conducted pursuant to the Offering Documents. As such, each is liable for the misrepresentations and omissions contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.

78.     By reason of the conduct alleged, each of the Defendants violated Section 11 of the Securities Act.

79.     Plaintiffs and members of the Class acquired Sundial common stock pursuant to the Offering Documents used for the IPO, and, at the time of their purchases, were without knowledge of the wrongful conduct alleged herein. This claim has been brought within one year of the discovery of the untrue statements and omissions and within three years of the date of the IPO.

80.     Plaintiffs and members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e).

**COUNT II**

**Violation of Section 12(a)(2) of the Securities Act Against Sundial and the Underwriter Defendants**

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

82.     By means of the Offering Documents, Defendants promoted and sold Sundial common stock in the IPO, and therefore are liable under Section 12(a)(2) for the

misrepresentations and omissions contained in the Offering Documents.

83.     At the time of their purchases, Plaintiffs and the Class did not know, nor in the exercise of due diligence could have known, of the material misstatements and omissions in the Offering Documents.

84.     Plaintiffs and the Class sustained substantial damages as a direct and proximate result of violations of Section 12(a)(2).

85.     Accordingly, members of the Class have the right to rescind and recover the consideration paid for their shares, or to recover rescissory or other damages to the maximum extent permitted by law, and hereby tender (to the extent tender is required) their shares. Class members who have sold their common stock seek damages to the maximum extent permitted by law.

**COUNT III**

**<u>Violation of Section 15 of the Securities Act Against the Individual Defendants</u>**

86.     Plaintiffs repeat and incorporates each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

87.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

88.     Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Sundial within the meaning of Section 15 of the Securities Act. Individual Defendants had the power and influence and exercised the same to cause Sundial to engage in the acts described herein.

89.     Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

90.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action pursuant to Fed. R. Civ. P. 23, designating Plaintiffs as class plaintiffs, and approving Plaintiffs' counsel as class counsel;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expenses and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: February 18, 2020                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

*/s/ Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Tel: (215) 686-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
          lheifetz@rosenlegal.com

and

**LEVI & KORSINSKY, LLP**

Adam M. Apton
Nicholas I. Porritt
55 Broadway, 10th Floor
New York, NY 10006
Tel : 212-363-7500
Fax : 212-363-7171
Email: nporritt@zlk.com
          aapton@zlk.com

Elizabeth K. Tripodi
1101 30th Street NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax : 212-363-7171
Email: etripodi@zlk.com

***Co-Lead Counsel for Plaintiffs and the Class***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 18, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such to all CM/ECF participants.

Dated: February 18, 2020

/s/ <em>Jacob A. Goldberg</em>

Jacob A. Goldberg