# Exhibit 3

Case 1:19-cv-08913-ALC-SN    Document 71-3    Filed 05/27/20    Page 2 of 31

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| *In re Sundial Growers Inc. Securities Litigation* | Index No.: 655178/2019<br><br>Commercial Division<br><br>Barry R. Ostrager, J.S.C.<br>Part 61<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

## CONSOLIDATED COMPLAINT FOR VIOLATIONS OF
## THE SECURITIES ACT OF 1933

**ROBBINS GELLER RUDMAN & DOWD LLP**
Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
srudman@rgrdlaw.com

Brian E. Cochran
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
bcochran@rgrdlaw.com

**KAPLAN FOX & KILSHEIMER LLP**
Robert N. Kaplan
Frederic S. Fox
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
rkaplan@kaplanfox.com
ffox@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for the Proposed Class*

(Additional counsel listed on signature page)

Dated: November 8, 2019

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ...................................................................................... 1

II.   JURISDICTION AND VENUE ................................................................................. 3

III.  PARTIES .................................................................................................................. 6

    a.   Plaintiffs ........................................................................................................... 6

    b.   Defendants ........................................................................................................ 6

        i.    Sundial ................................................................................................6

        ii.   The Individual Defendants...................................................................7

        iii.  The Underwriter Defendants................................................................8

IV.   SUBSTANTIVE ALLEGATIONS .......................................................................... 12

    A.   Background on Sundial's Business and Operations................................................. 12

    B.   Sundial's Materially False and Misleading Registration Statement........................ 14

V.    CLASS ACTION ALLEGATIONS .......................................................................... 20

VI.   CAUSES OF ACTION.............................................................................................. 21

    FIRST CAUSE OF ACTION *For Violation of Section 11 of the
    Securities Act Against All Defendants* ...........................................................21

    SECOND CAUSE OF ACTION *For Violation of Section 12(a)(2)
    of the Securities Act Against All Defendants* ..................................................23

    THIRD CAUSE OF ACTION *For Violation of Section 15
    of the Securities Act Against All Defendants other
    than Defendant Puglisi* .................................................................................25

ii

NYSCEF DOC. NO. 18

Plaintiffs Trisha Peters ("Peters"); Diana Hoeller ("D. Hoeller"); Kenneth M. Hoeller ("K. Hoeller"); Trevon Clarke ("Clarke"); and Roland Salem ("Salem"), (collectively "Plaintiffs"), by their attorneys, on behalf of themselves and all others similarly situated, allege the following based upon the investigation of Plaintiffs' counsel, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Sundial Growers Inc.'s ("Sundial" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, media, news and analyst reports about the Company, other publicly available data, including, but not limited to, publicly available trading data relating to the price and trading volume of Sundial's common stock. Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for formal discovery.

## I.      NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of Sundial in and/or traceable to Sundial's August 1, 2019 initial public offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"). This action asserts strict liability and negligence claims under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2) and 77o) against Sundial, the Company's underwriters for the IPO and certain Sundial officers, directors and representatives.

2.      Sundial is an Alberta, Canada-based producer of cannabis products. Sundial commenced cannabis production in December 2018 and within months sought to access the

1

public equity markets through an IPO.

3. In October 2018, Canada became the first major industrialized nation to legalize adult-use cannabis at the federal level, sparking what has been called a "green rush." In 2018, over 50 cannabis producers effectuated IPOs of equity to the investing public. In the midst of this funding boom, Sundial sought to distinguish itself from other cannabis producers as a high quality producer, which would allow the Company to charge more for shares sold in its IPO.

4. Specifically, the Sundial IPO Registration Statement filed with the SEC on August 1, 2019 (defined herein) represented that Sundial was a producer of "high-quality" and "premium" cannabis through its indoor grow rooms at its facilities in Olds and Rocky View, Alberta. The Registration Statement highlighted the purported exceptional consistency and quality of Sundial's cannabis products and represented that this premium quality allowed the Company to charge higher prices and provided it with key competitive advantages over other cannabis producers. High quality and product consistency were important factors in persuading cannabis users to move their purchases from the black market to higher-priced legal producers, and thus critical to the Company's revenues, earnings, cash flows and operations.

5. These and similar representations in the Registration Statement were diametrically opposed to reality. Specifically, the Registration Statement failed to disclose that Sundial had produced and sold more than a half-ton of defective cannabis product, maintained grossly deficient quality control and manufacturing processes, failed to resolve a systemic mold infection, and suffered a fatal breakdown in the business relationship with one of its key customers. An important customer of Sundial, Zenabis Global Inc. ("Zenabis"), had rejected 554 kilograms of cannabis supplied by the Company due to its materially deficient quality. The product that Sundial had sold to Zenabis contained mold, bits of rubber gloves, and other non-

2

cannabis materials, such as jewelry. This adulterated cannabis was not saleable and failed to satisfy Sundial's contractual commitments to Zenabis, and did not constitute the "highest quality cannabis on the market" as Defendants represented. The debacle impaired Sundial's ability to attract and retain customers and threatened its most important revenue streams. Indeed, as a result of its receipt of adulterated cannabis that violated Sundial's contractual commitments, Zenabis ultimately cancelled its supply agreement with the Company. All of these material, adverse facts predated the IPO, but were not disclosed to Sundial investors. Instead, the Registration Statement claimed Sundial "produce[d] high-quality, consistent cannabis" and was then "*currently* produc[ing] and market[ing] premium cannabis." (Emphasis added).

6.       On August 1, 2019, Sundial filed with the SEC on Form 424B4 the final prospectus for the common stock IPO (the "Prospectus"), which forms part of the Registration Statement (the Prospectus and Registration Statement are collectively referred to herein as the "Registration Statement"). Defendants sold 11 million shares of Sundial common stock pursuant to the Registration Statement to the investing public at $13 per share, generating approximately $143 million in gross proceeds.

7.       As of the close of trading on November 7, 2019, Sundial shares closed at $3.51 per share—a decline of 73% from the $13 per share price in the IPO just three months previously.

## II.     JURISDICTION AND VENUE

8.       This Court has original subject matter jurisdiction under the New York State Constitution, Article VI, Section 7(a), and Section 22 of the Securities Act, 15 U.S.C. §77v. Removal is barred by Section 22 of the Securities Act.

9.       This Court has personal jurisdiction over each of the defendants under Sections

3

NYSCEF DOC. NO. 18

301 and 302 of the New York Civil Practice Law and Rules ("CPLR"), and venue is proper in this County under Section 11 of the Securities Act and CPLR Section 503.

10. Defendants have sufficient contacts with New York, or otherwise purposefully availed themselves of benefits from New York or have property in New York so as to render the exercise of jurisdiction over each by New York courts consistent with traditional notions of fair play and substantial justice.

11. Sundial's common stock is only listed on the Nasdaq, which is based in this County at 4 Times Square, New York, New York, and Sundial common stock is not listed on a Canadian exchange. Sundial appointed Equity Stock Transfer, LLC, with its principal office in New York, New York, as its transfer agent and registrar for the Company's common shares in the United States, which trade on the Nasdaq in New York. The Company's registered agent for service of process in the United States is Corporation Service Company, 1180 Avenue of the Americas, Suite 210, New York, NY 10036-8401.

12. The Underwriter Defendants (defined below) conducted the IPO in New York, drafted the Registration Statement in New York, New York, disseminated the statements alleged to be materially false and misleading in New York, New York, and affirmatively solicited Sundial investors through the Registration Statement in New York, New York.

13. The Underwriter Defendants, or their affiliates or subsidiaries each have substantial operations in New York. Defendant Cowen and Company, LLC ("Cowen"), which served as a placement agent or book-running manager for the IPO, maintains its headquarters in New York City in this County.

14. Sundial and the Underwriter Defendants entered into an underwriting agreement, dated July 31, 2019, with respect to the shares being sold in Sundial's IPO ("Underwriting

4

NYSCEF DOC. NO. 18

Agreement"). The Underwriting Agreement "is governed and construed in accordance with the laws of the State of New York" and the parties to the Underwriting Agreement "irrevocably submit[ed] for purposes of any action arising from [the Underwriting Agreement] brought by the other party hereto to the jurisdiction of the courts of New York State located in the Borough of Manhattan and the U.S. District Court for the Southern District of New York."

15.    The Underwriting Agreement provided that the Underwriter Defendants would purchase Sundial shares from the Company and that payment would be made through the facilities of The Depository Trust Company (the "DTC"), which is a limited purpose trust company formed under the Banking Law of New York State and located at 55 Water Street, New York, NY 10041.

16.    Under the Underwriting Agreement, Sundial caused the certificates representing Sundial shares issued in the IPO to be made available at the office of the DTC in New York before the closing of the IPO.

17.    According to the Prospectus, Osler, Hoskin & Harcourt LLP ("Osler") acted as legal counsel for the Underwriter Defendants in connection with the IPO. According to Osler's website, Rob Lando, an Osler partner, with an office at 620 8th Avenue, 36th Floor, New York, New York, represented the Underwriter Defendants in Sundial's IPO of common shares and Nasdaq listing.

18.    On or around July 31, 2019, a meeting was held at Osler's office in New York at which the final drafts of IPO-related documents were available for review by executives, officers or agents of Sundial and the Underwriter Defendants, and the closing was held at Osler's office in New York City in this County.

19.    According to Nasdaq's website, on August 1, 2019 senior officers and directors of

5

Sundial, including Defendants Torsten Kuenzlen ("Kuenzlen"); Edward Hellard ("Hellard"); James Keough ("Keough"); and Elizabeth Cannon ("Cannon"), visited the Nasdaq MarketSite in Times Square in New York City to ring the opening trading bell on the day of Sundial's IPO.

### III. PARTIES

#### A. Plaintiffs

20. Plaintiff Peters purchased Sundial common stock traceable to the false and misleading Registration Statement and was damaged thereby.

21. Plaintiffs D. Hoeller and K. Hoeller purchased Sundial common stock traceable to the false and misleading Registration Statement and were damaged thereby.

22. Plaintiff Clarke purchased Sundial common stock traceable to the false and misleading Registration Statement and was damaged thereby.

23. Plaintiff Salem purchased Sundial common stock directly in the IPO at the IPO price of $13 per share and was damaged thereby.

#### B. Defendants

##### i. Sundial

24. Defendant Sundial is incorporated in the Province of Alberta, Canada and maintains its principal executive offices at #200,919 – 11 Avenue SW, Calgary, AB T2R 1P3, Canada. Sundial purports to produce and market craft pioneering cannabis brands to "Heal, Help and Play." Sundial operates five facilities, including two facilities in Alberta, Canada and three in the United Kingdom, and, as of August 2019, was building a third Canadian facility in British Columbia. The Company's common shares are listed for trading only on the Nasdaq, which is based in New York at 4 Times Square, New York, NY, under the ticker symbol "SNDL." The Company's registered agent for service of process in the U.S. is Corporation Service Company,

6

1180 Avenue of the Americas, Suite 210, New York, NY 10036-8401. Defendant Sundial is strictly liable for the false and misleading statements made in the Registration Statement.

### ii. The Individual Defendants

25. Defendant Kuenzlen is, and was at the time of the IPO, a member of Sundial's Board of Directors and the Company's Chief Executive Officer. At the time of the IPO, Kuenzlen owned approximately 3.7 million Sundial shares, or 4.94% of the Company's common stock.

26. Defendant James Keough ("Keough") is, and was at the time of the IPO, the Chief Financial Officer of Sundial.

27. Defendant Hellard, is, and was at the time of the IPO, Sundial's Executive Chairman of the Company's Board of Directors. At the time of the IPO, Hellard owned approximately 24.5 million Sundial shares, or 32.3% of the Company's common stock.

28. Defendant Greg Mills is, and was at the time of the IPO, Non-Executive Chairman of the Company's board of directors.

29. Defendant Gregory Turnbull is, and was at the time of the IPO, a member of the Company's board of directors.

30. Defendant Lee Tamkee is, and was at the time of the IPO, a member of the Company's board of directors.

31. Defendant Cannon is, and was at the time of the IPO, a member of the Company's board of directors.

32. Defendant Donald Puglisi was Sundial's duly authorized U.S. representative at the time of the IPO.

33. The defendants referenced above in ¶¶ 25-32 signed the Registration Statement

7

used to conduct the IPO and solicit Sundial investors, and are referred to herein as the "Individual Defendants." The Individual Defendants were key members of the IPO working group and group of Sundial executives, directors and agents who pitched investors to purchase the Sundial shares sold in the IPO. Each of the Individual Defendants reviewed, helped prepare and signed the Registration Statement, and participated in the solicitation and sale of the Company's common stock to investors in the IPO for their own financial benefit and the financial benefit of Sundial.

### iii.    The Underwriter Defendants

34.    Defendant Cowen is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement, and solicited Sundial investors. Cowen's principal place of business is at 599 Lexington Avenue, New York, NY 10022. Cowen's registered agent for service of process in New York is Cogency Global Inc., 10 East 40th Street, 10th Floor, New York, NY 10016.

35.    Defendant BMO Nesbitt Burns Inc. ("BMO") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement. BMO's principal place of business is located at 100 King Street West, Toronto, Ontario M5X 1H3, Canada. Defendant BMO and its affiliate, BMO Capital Market Corp., with offices located at 3 Times Square, New York, NY 10036, disseminated the Registration Statement, or solicited Sundial investors through the Registration Statement.

36.    Defendant RBC Dominion Securities Inc. ("RBC") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement. RBC's principal place of business is located at

8

200 Bay Street, Suite 400, South Tower, Toronto, Ontario M5J 2W7, Canada. Defendant RBC and its affiliate, RBC Capital Markets, LLC, with offices located at 3 World Financial Center, 200 Vesey Street, New York, NY 10281, disseminated the Registration Statement, or solicited Sundial investors through the Registration Statement.

37.     Defendant Barclays Capital Canada Inc. ("Barclays") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement. Barclays' principal place of business is located at 333 Bay Street, Toronto, ON M5H 2R2, Canada. Defendant Barclays and its affiliate, Barclays Capital Inc., with offices located at 745 7th Avenue, New York, NY 10019, disseminated the Registration Statement, or solicited Sundial investors through the Registration Statement.

38.     Defendant CIBC World Markets Inc. ("CIBC") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement. CIBC's principal place of business is 161 Bay Street, Brookfield Place, Toronto, Ontario M5J 2S8, Canada. Defendant CIBC and its affiliate, CIBC World Markets Corp., with offices located at 425 Lexington Avenue, New York, NY 10017, disseminated the Registration Statement, or solicited Sundial investors through the Registration Statement.

39.     Defendant Scotia Capital Inc. ("Scotia") is an investment banking firm that acted as an underwriter of Sundial's IPO, helping to draft and disseminate the IPO documents, including the Registration Statement. Scotia's principal place of business is 40 King Street West Scotia Plaza 68th Floor Toronto, ON M5W 2X6, Canada. Defendant Scotia and its affiliate, Scotia Capital (USA) Inc., with offices located at 250 Vesey Street, New York, NY 10281,

9

disseminated the Registration Statement, or solicited Sundial investors through the Registration Statement.

40.    Defendants Cowen, BMO and RBC were joint book-running managers or lead underwriters for the IPO.  Defendants Barclays and CIBC were bookrunners, and Scotia was a co-manager for the IPO.

41.    Defendants Cowen, BMO, RBC, Barclays, CIBC and Scotia are referred to herein as the "Underwriter Defendants."

42.    Subject to the terms and conditions of the Underwriting Agreement, each of the Underwriter Defendants severally agreed to purchase from Sundial the number of shares set forth below at a price of US$13 per share payable in cash on the closing date of the IPO:

| Underwriter Defendant | Number of Shares |
|---|---|
| Cowen | 3,575,000 |
| BMO | 3,135,000 |
| RBC | 1,760,000 |
| Barclays | 990,000 |
| CIBC | 990,000 |
| Scotia | 550,000 |
| Total | 11,000,000 |

43.    The Underwriter Defendants resold 11 million Sundial shares to Sundial investors in the IPO.  The Underwriter Defendants were also granted an option, exercisable within 30 days from the close of the IPO to purchase an additional 1.65 million Sundial shares.  The Underwriter Defendants declined to exercise this option.

44.    Under the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

a.    The Underwriter Defendants served as the underwriters for Sundial's IPO and shared more than $8.5 million in fees collectively for their services. The Underwriter

10

Defendants determined that in return for their share of the IPO proceeds, they were willing to offer or sell Sundial common stock in the IPO. Each of the Underwriter Defendants designated personnel to the IPO working group, including investment bankers, analysts, associates, and counsel, to market Sundial's stock, and those personnel worked on and approved the content of Sundial's Registration Statement and road show presentation. The Underwriter Defendants arranged a road show before the IPO during which they and Sundial executives met with potential investors and presented misleading information about the Company, its operations, and its financial prospects. The Underwriter Defendants also promoted Sundial's IPO to their clients and sold shares to online brokerage account holders.

b.      The Underwriter Defendants and Sundial agreed that Sundial would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. The Underwriter Defendants also made certain that Sundial had purchased directors' and officers' liability insurance.

c.      Representatives of the Underwriter Defendants assisted Sundial and the Individual Defendants in planning the IPO, and purportedly conducted an investigation into the business and operations of Sundial, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Sundial's operations and financial prospects, to Sundial's executives, employees, and Sundial's Olds and Rocky View facilities and grow rooms, and to Sundial's supply agreements and customers.

d.      In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Sundial's management,

11

Case 1:19-cv-08913-ALC-SN    Document 71-3    Filed 05/27/20    Page 15 of 31

senior executives, and outside counsel and engaged in "drafting sessions" in advance of the IPO. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price range at which Sundial stock would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Sundial would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement.

e.    The Underwriter Defendants solicited and sold in the IPO Sundial stock to members of the Class, including Plaintiff Salem, who purchased Sundial common stock directly in the IPO at the IPO price of $13 per share and was furnished with a copy of the Prospectus.

45.    The Company, the Individual Defendants and the Underwriter Defendants are referred to herein collectively as the "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background on Sundial's Business and Operations

46.    Around two months after Canada legalized recreational cannabis, in December 2018, Sundial commenced cannabis production.  Sundial generates revenues from sales of its cannabis through supply agreements and through sales to other licensed producers.

47.    Sundial's brands include "Sundial Cannabis," "Top Leaf," and "BC Weed Co." The Company claims that its "Sundial Cannabis"-branded dried flower cannabis is "designed for modern cannabis consumers who want a safe, consistent, functional product that emphasizes a desired experience."

48.    At the time of Sundial's IPO, all of the Company's cultivation and production activities were conducted at its Olds and Rocky View facilities, both of which are located in Alberta, Canada.

12

49.    The Company's "flagship facility" is the Olds facility, where the Company cultivates cannabis for the Canadian market using purpose-built indoor modular grow rooms. Company personnel complete each step of the growing process at the Olds facility including cloning, flowering, harvesting, drying, trimming, curing, testing product and packaging and shipping. At the time of the IPO, the Olds facility contained 60 grow rooms across 210,000 square feet.

50.    Unlike the Olds facility, the primary purpose of the Rocky View facility is the research and development of new strains of cannabis and growing methods. At the time of the IPO, the Rocky View facility contained three grow rooms across 31,000 square feet.

51.    The Company has a producer's license at both the Olds and Rocky View facilities. This license allowed the Company to sell live plants to other licensed producers. In addition, the Company possessed a processing and sales license from Health Canada, a Canadian governmental regulator, which allowed the Company to sell its Alberta grown cannabis into the medical and adult-use markets. The maintenance of these licenses is critical to the ongoing viability of the Company and its ultimate financial success.

52.    On July 5, 2019, the Company filed its Registration Statement on Form F-1 for the IPO, which was signed by the Individual Defendants. After amendments on July 23, 2019 and July 30, 2019, the Registration Statement was declared effective by the SEC on July 31, 2019.

53.    On July 31, 2019, Sundial issued a press release titled "Sundial Announced Pricing of Upsized Initial Public Offering" that stated, in part, that Sundial "announced the pricing of its upsized initial public offering of 11,000,000 common shares at a price to the public of US$13.00 per share. In addition, the underwriters have been granted a 30-day over-allotment

13

option to purchase up to 1,650,000 additional common shares."

54.    On August 1, 2019, Sundial filed the Prospectus with the SEC and sold 11 million shares of Sundial common stock to the investing public at $13 per share for proceeds to Sundial of approximately $134.4 million, excluding $8.58 million in commissions paid to the Underwriter Defendants.

55.    Copies of the Prospectus were made available to Sundial investors by Defendant Cowen, through Broadridge Financial Services, located at 1155 Long Island Avenue, Edgewood, NY 11717.

56.    On August 1, 2019, the Company's shares were listed for trading on the Nasdaq in U.S. dollars under the ticker symbol "SNDL".

**B.    Sundial's Materially False and Misleading Registration Statement**

57.    The Registration Statement contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make required disclosures under the rules and regulations governing the preparation of such documents.

58.    For example, the Registration Statement represented that Sundial was a producer of "high-quality cannabis in small batches" and "premium, high quality brands"; that "we produce high-quality, consistent cannabis" and "currently produce and market premium cannabis"; that the Company's operating model resulted in "strong customer loyalty"; and that the Company's products were the "highest quality cannabis on the market." Similarly, the Registration Statement represented that Sundial was "developing high-quality, premium cannabis brands for the adult-use market." The Registration Statement likewise represented that Sundial's market position was built on "offering differentiated brands underpinned by premium products

14

that deliver consistent and superior user experiences."

59.    Sundial represented that at the time of the IPO it was producing "high-quality" and "premium" cannabis through indoor grow rooms in its production facilities that were "specifically designed to produce high-quality cannabis flower and products," stating, in pertinent part, the following:

> Our purpose-built indoor modular grow rooms enable us to produce large volumes of high-quality cannabis in small batches . . . We believe that the combination of this craft-at-scale cultivation model, our diverse genetic library and our experienced cannabis cultivation team will result in the highest quality cannabis on the market. . .
>
> We are producing premium cannabis products in purpose-built indoor growing rooms. . . .

60.    The Registration Statement further represented that the purported superior quality of Sundial's cannabis was a differentiating strength of the Company and a key competitive advantage over other cannabis producers. The Registration Statement represented, in pertinent part, as follows:

> **Our Strengths**
>
> *We believe that we have a differentiated operating model designed to generate superior margins and shareholder returns, underpinned by the following competitive strengths.*
>
> *   *   *
>
> *Consumer-centric global brands that deliver premium experiences*
>
> *… Core to the establishment of superior brands are high quality and consistent product offerings that are targeted to meet evolving consumer needs.* We strengthen our brands through innovative, iterative and targeted product development that leverages a flexible production infrastructure and continuous consumer feedback loops. … We believe that this approach will result in brands that resonate with consumers, leading to brand recognition and loyalty.
>
> *   *   *
>
> *Operating model that strives to deliver optimal profitability for all stakeholders*

15

We believe our integrated CPG [consumer packaged goods] operating model will deliver superior benefits for all stakeholders in the value chain. ***Our focus on the premium segment of the global cannabis market is expected to support higher prices and, as a result, deliver higher margins to our distribution and retail partners, as well as the Company. We also believe that our premium, high quality brands and products will deliver superior consumer experiences, resulting in strong consumer loyalty and advocacy***. Our tailored supply chains are intended to optimally balance high quality products and low-cost production, which we believe will further contribute to our superior margins and maximize stakeholder returns over time.[1]

61.     The representations in paragraphs 58-60 were materially false and misleading because, rather than the "highest quality" "premium" and "consistent" product on the market, Sundial was producing hundreds of kilograms of adulterated cannabis products that were of low quality, including significant batches that were not fit for human consumption or that failed to meet the Company's contractual commitments to its most important customers. In addition, Sundial maintained materially deficient manufacturing and quality control processes which had led to the production and distribution of these adulterated cannabis products. Sundial's grow rooms were suffering from chronic contamination including crop diseases, bugs, systematic mold infections and other quality control problems. The grow facilities were kept in dilapidated conditions which had generated mold spores, leading to crop infections. These problems were so severe, that Sundial had since 2018 tasked its Cultivation and Innovative Crop Management teams to abate the issues, but to no avail.

62.     Furthermore, an important customer of Sundial, Zenabis, had rejected 554 kilograms (more than a ***half-ton***) of Sundial cannabis due to its materially deficient quality. The product had been adulterated with mold, bits of rubber gloves, and other non-cannabis materials, such as jewelry. By comparison, the Company only sold 323 kilogram equivalents of cannabis

---

[1]     Emphasis has been added unless otherwise noted.

16

during the entire quarter ended March 31, 2019 – or 231 kilograms *less* than the defective batch. These material quality control deficiencies placed the Company's reputation at risk, undermined its ability to attract and retain customers, and threatened its most important revenue streams. The deficiencies also undermined the Company's represented competitive advantages, since rather than being distinguished by its superior quality products, the Company was, in fact, producing deficient cannabis that was not even saleable. Indeed, as a result of its receipt of adulterated cannabis that violated Sundial's contractual commitments, Zenabis cancelled its supply agreement with the Company.

63.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. 929.303 ("Item 303") required the Registration Statement to disclose: (ii) unusual events, transactions or significant economic changes that materially affected the amount of Sundial's reported income from continuing operations and the extent of such changes; and (ii) known trends or uncertainties reasonably expected to have a material impact on the Company's net sales or revenues or income from continuing operations. The material quality defects and ongoing and persistent mold in the Company's grow rooms and cannabis products, and the return or rejection of hundreds of kilograms in defective products by Zenabis represented unusual events and transactions and known trends and uncertainties that were required to be disclosed under Item 303 because they were known and likely to (and did) have a material unfavorable impact on the Company's net sales, revenues and income from continuing operations.

64.    In addition, Item 105 of SEC Regulation S-K, 17 CFR. 5229.105 ("Item 105") required in the "Risk Factors" section of the Registration Statement a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk. Because the omitted material facts alleged herein were not disclosed, as well

17

Case 1:19-cv-08913-ALC-SN     Document 71-3     Filed 05/27/20     Page 21 of 31

as the consequent material adverse effects on the Company's future results and prospects, Defendants violated Item 105. Indeed, rather than disclosing the significant quality control deficiencies detailed herein, the Registration Statement contained boilerplate risk disclosures that were themselves materially misleading. For example, the Registration Statement represented that certain risks "may" or "could" adversely impact Sundial's business in the future, including the following potential risks that had already occurred:

- "Failure in our quality control systems *may* adversely impact our sales volume, market share and profitability";

- "disruptions at, or adverse changes or developments affecting our Olds Facility or Rocky View Facility, including . . . disease or infestation of crops . . . *could* materially adversely impact our production of cannabis"; and

- "risks inherent in an agricultural business, including the risk of crop failure."

65.     While the Registration Statement purported to warn that these risks "*may*" or "*could*" occur in the future, the Registration Statement failed to disclose that these potential risks had *already* occurred and were ongoing at the time of the IPO. At the time of the IPO, Sundial's facilities were experiencing extraordinary crop defects due to diseases, bugs and systemic mold infections that Sundial's Cultivation and Innovative Crop Management teams had tried to abate since 2018, but failed. Moreover, by the time of the IPO, Sundial's quality control systems had *already* suffered material quality control defects, the Company had *already* produced more than a half-ton of defective, low-grade cannabis product, and a critical customer had *already* returned or rejected 554 kilograms of adulterated cannabis and was in the process of cancelling its supply agreement with Sundial. The Registration Statement's failure to disclose these extraordinary deficiencies specific to Sundial rendered its boilerplate disclosures of potential adverse events

18

Case 1:19-cv-08913-ALC-SN   Document 71-3   Filed 05/27/20   Page 22 of 31

that could occur in the future and which applied to virtually any agricultural company materially

misleading.

66.    On August 16, 2019 – only about **two weeks** after the IPO – *MarketWatch*

published an article detailing severe quality control deficiencies in Sundial products that

impacted a half-ton of product, the equivalent of 10% of the Company's sales for the quarter

ended June 30, 2019 and **60% more than the Company sold in its entire 1Q19**.    The article

stated the following in part:

> The newest cannabis company on Wall Street, Sundial Growers Inc., sold a half
> ton of pot that was returned by corporate buyer Zenabis Global Inc. because it
> contained visible mold, parts of rubber gloves and other non-cannabis material,
> according to people familiar with the matter. The attempted sale would be the
> equivalent of 10% of Sundial's total second-quarter cannabis sales of five metric
> tons. The batch of cannabis would be worth roughly C$2.5 million ($1.9 million),
> assuming a price of C$5 per gram.

67.    The *MarketWatch* article also noted that these significant quality defects were not

disclosed in the Registration Statement, stating in part:

> Sundial included a number of risks around inventory spoilage in its IPO filing but
> [] did not include a reference to a half ton of returned cannabis. Sundial did not
> mention the half-ton return during a road show presentation in Toronto, according
> to one investor who heard the pitch. In the IPO filing and its quarterly-earnings
> filing with the Securities and Exchange Commission, the company disclosed
> about $3.3 million in penalties for not delivering cannabis as promised to
> partners; those contingencies were from 2018.

68.    Statements by Zenabis, the important Company customer identified in the

*MarketWatch* report, confirm that Sundial's serious quality control problems predated the IPO by

months and were so significant that they led to the termination of its supply agreement.    The

following statements describing the situation were made by Zenabis in connection with its

disclosure on August 14, 2019 of its financial results for the quarter ended June 30, 2019:

> Certain third-party producers failed to supply saleable cannabis in line with
> contractual obligations. Due to quality issues, Zenabis had to return or reject a

19

Case 1:19-cv-08913-ALC-SN     Document 71-3     Filed 05/27/20     Page 23 of 31

total of 554 kg of cannabis from a third-party [*i.e.*, Sundial]. To ensure there was sufficient inventory on-hand in order to provide consistent supply to provincial counterparties beyond June of 2019, Zenabis held back certain products it had produced in May and June. Subsequent to the quarter end, Zenabis provided notice to terminate its agreement to purchase cannabis from the third-party who shipped the cannabis that was not saleable.

69.     Sundial's share price has declined precipitously since the IPO. As of the close of trading on November 7, 2019, Sundial shares closed at $3.51 per share, 73% below the IPO price.

## V.     CLASS ACTION ALLEGATIONS

70.     Plaintiffs bring this action as a class action on behalf of a class consisting of all persons or entities who purchased Sundial common stock in and/or traceable to the IPO (the "Class") and were damaged. Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

71.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sundial or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

72.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

20

Case 1:19-cv-08913-ALC-SN   Document 71-3   Filed 05/27/20   Page 24 of 31

73.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

74.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a.     whether Defendants violated the Securities Act;

    b.     whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein; and

    c.     to what extent the members of the Class have sustained damages and the proper measure of damages.

75.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*For Violation of Section 11 of the Securities Act Against All Defendants*

76.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

77.     This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, against all Defendants.

78.     This Cause of Action does not sound in fraud.  Plaintiffs do not allege that the

Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. This Count is based solely in strict liability as against Sundial, and is based in negligence as against all other Defendants.

79.    Defendant Sundial was the issuer, within the meaning of Section 11 of the Securities Act and pursuant to the Registration Statement, of the registered securities sold in the IPO. As alleged above, Sundial issued and sold to the Underwriter Defendants 11 million shares of Sundial common stock in the IPO who, in turn, resold these shares to Plaintiffs and the class.

80.    Each of the Individual Defendants signed the Registration Statement as a senior officer, director and/or authorized representative of Sundial within the meaning of Section 11 of the Securities Act.

81.    The Underwriter Defendants acted as the underwriters for the IPO within the meaning of Section 11 of the Securities Act by selling and distributing the Sundial common stock offered to the investing public and purchased by Plaintiffs and members of the Class, and solicited investors through the Registration Statement.

82.    The common stock described in this Count was issued and sold pursuant to the Registration Statement. As alleged above, Sundial's IPO Registration Statement contained untrue statements of material facts or omitted material facts necessary to make the statements contained in the Registration Statement not misleading.

83.    None of the Individual Defendants or Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

84.    In connection with offering the registered securities to the public and the sale of

Case 1:19-cv-08913-ALC-SN    Document 71-3    Filed 05/27/20    Page 26 of 31

those securities, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

85.     Plaintiffs and the Class have suffered substantial damage in connection with their purchase of Sundial common stock sold in the IPO.  Plaintiffs did not know, nor in the exercise of reasonable diligence could they have known, that the Registration Statement, contained untrue statements of material fact or failed to disclose material facts when they purchased the Sundial common stock issued in the IPO.

86.     By reason of the foregoing, Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Class.

87.     This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

## SECOND CAUSE OF ACTION
### *For Violation of Section 12(a)(2) of the Securities Act Against All Defendants*

88.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

89.     This Cause of Action is brought pursuant to Section 12(a)(2) of the 1933 Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against all Defendants by Plaintiff Salem.

90.     This Cause of Action does not sound in fraud.  Plaintiff Salem does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

91.     Defendants promoted, offered and sold Sundial common stock to Plaintiff Salem and other members of the Class for Defendants' benefit and the benefit of their associates by means of the Prospectus which, as alleged above, included untrue statements of  material facts or

23

omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. Furthermore, the Underwriter Defendants solicited their brokerage clients and other members of the investing public to submit indications of interest and subscriptions to purchase shares in the IPO.

92. Defendants owed Plaintiff Salem and the other members of the Class who purchased Sundial common stock pursuant to the Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus as set forth above.

93. Plaintiff Salem did not know, nor in the exercise of reasonable diligence could Plaintiff Salem have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff Salem acquired Sundial common stock.

94. Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

95. By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the 1933 Act. As a direct and proximate result of such violations, Plaintiff Salem and the other members of the Class who purchased Sundial common stock pursuant to the Prospectus sustained substantial damages in connection with their purchases of stock. Accordingly, Plaintiff Salem and the other members of the Class who purchased Sundial common stock issued pursuant to the Prospectus, seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for their shares, and hereby tender their common stock to Defendants.

24

Case 1:19-cv-08913-ALC-SN   Document 71-3   Filed 05/27/20   Page 28 of 31

96.     This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

## THIRD CAUSE OF ACTION
### *For Violation of Section 15 of the Securities Act Against the Individual Defendants other than Defendant Puglisi*

97.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

98.     This Count is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against the Individual Defendants, other than Defendant Puglisi, on behalf of themselves and members of the Class.

99.     As set forth in Counts I and II, Sundial is strictly liable under Sections 11 and 12(a)(2) of the Securities Act for untrue statements of material fact in the Registration Statement and Prospectus.

100.    At all relevant times, the Individual Defendants named in this Count were controlling persons of Sundial within the meaning of Section 15 of the Securities Act.

101.    As set forth herein, by virtue of their positions, voting power, agency, stock ownership, rights as against Sundial, and/or specific acts, the Individual Defendants named in this Count had the requisite power to directly or indirectly control or influence Sundial to engage in the acts described herein, including by causing Sundial to conduct the IPO, and exercised such power.

102.    By virtue of their positions as officers, directors and/or major shareholders of Sundial, and their status as signatories of the Registration Statement, the Defendants against whom this Count is brought had the power to control, and did control, Sundial in closing the

25

IPO, including controlling the contents of the Registration Statement and Prospectus, which contained materially false statements. As a group, the director and officers of Sundial beneficially owned over 47% of the Company's common stock at the time of the IPO, with Defendant Hellard alone controlling over 33% of the Company's shares.

103.    The Individual Defendants named in this Count each had a financial interest in conducting the IPO.  These Individual Defendants were each critical to effecting the IPO, based on his or her signing and/or authorization of the signing of the Registration Statement, by participating to execute the IPO, and by having otherwise directed through his or her authority the processes leading to execution of the IPO, including obtaining the Underwriter Defendants' registration, qualification, authorization, pricing, offering to the public, and issuance and sale of the shares in the IPO.

104.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Sundial, each of the Individual Defendants named in this Count is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as Sundial is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired the Sundial common stock issued in the IPO.

105.    As a direct and proximate result of the conduct of the Individual Defendants named in this Count, members of the Class suffered damages in connection with their purchase or acquisition of Sundial common stock.

106.    This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

26

Case 1:19-cv-08913-ALC-SN   Document 71-3   Filed 05/27/20   Page 30 of 31

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Certifying this class action under Article 9 of the CPLR, certifying Plaintiffs as Class representatives and Plaintiffs' Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissionary measure of damages; and

E.      Awarding disgorgement, or such other equitable, injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: November 8, 2019
       New York, New York

27

**ROBBINS GELLER RUDMAN &**
**DOWD LLP**

/s/ _____

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, New York 11747
Telephone: (631) 367-7100
srudman@rgrdlaw.com

Brian E. Cochran
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: (312) 674-4674
bcochran@rgrdlaw.com

**KAPLAN FOX & KILSHEIMER LLP**

/s/ _____

Robert N. Kaplan
Frederic S. Fox
Jeffrey P. Campisi
Jason A. Uris
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
rkaplan@kaplanfox.com
ffox@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for the Proposed Class*

**SCHALL LAW FIRM**
Brian Schall
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (310) 301-3335
Fax: (310) 338-0192
brian@schallfirm.com

**LAW OFFICE OF THOMAS G.**
**AMON**
Thomas G. Amon
420 Lexington Avenue, Suite 1402
New York, NY 10170
Telephone: 212/810-2430
tamon@amonlaw.com

**ROBBINS ARROYO LLP**
Brian J. Robbins
Stephen J. Oddo
Jonathan D. Bobak
5040 Shoreham Place
San Diego, CA 92122
Telephone: 619/525-3990
619/525-3991 (fax)
brobbins@robbinsarroyo.com
soddo@robbinsarroyo.com
jbobak@robbinsarroyo.com

*Additional Plaintiffs' Counsel*

28